Robert MacDOUGAL, Robert Freiler and Robert Ludlow, Plaintiffs,

v.

CATALYST NIGHTCLUB, Randall Kane dba the Catalyst Nightclub, Defendants.

No. C 96–3991 MJJ.

United States District Court, N.D. California.

July 21, 1999.

Paul L. Rein, Timothy S. Thimesch, Law Offices of Paul L. Rein, Oakland, for Plaintiffs.

Paul P. Burdick, Dunlap & Burdick PC, Santa Cruz, CA, for Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS

JENKINS, District Judge.

### INTRODUCTION

Plaintiffs have filed a motion for attorneys' fees, litigation expenses and costs as allowed under the July 9, 1998, Consent Decree and Settlement Agreement entered into by both parties. Rein Declaration, Exh. L. The Court has reviewed the papers submitted by both parties [1] and issues the following memorandum and order.

### FACTUAL BACKGROUND

This motion is a result of the second of two lawsuits filed against defendants, who operate the Catalyst Nightclub. The first lawsuit (*"Catalyst I "*) was filed on December 23, 1994 by plaintiffs Armando Plastina, Robert Freiler and John Daugherty, three disabled patrons of the Catalyst. The *Catalyst I* plaintiffs sought injunctive relief for defendants' failure to comply with the Americans With Disabilities Act of 1990 ("ADA") and California laws which require public facilities to provide access for the disabled. The *Catalyst I* plaintiffs also requested damages as allowed under California law and recovery of legal fees and expenses. *Catalyst I* was dismissed pursuant to a Release and Settlement Agreement dated March 10, 1996. Under the Agreement, the defendants agreed to provide accessible restrooms, a lift enabling disabled patrons to access the second floor of the club and set amounts for monetary damages and for attorneys' fees.

---

1. The Court has also reviewed *in camera* copies of plaintiffs' counsel's billing records from *Catalyst I* in determining the appropriateness of plaintiffs' request for attorneys' fees.

Unfortunately, the renovation was delayed by the death of defendant Robert Kane's ("Kane") wife in May of 1996. Plaintiffs were notified by a letter from Paul Burdick ("Burdick"), Kane's attorney, that the work on the lift would be completed by early June and that the restrooms would be accessible by early July. Burdick Decl. Exh. 3 at 1. Plaintiffs' attorney Paul Rein ("Rein") replied by letter confirming the new completion dates and that he would not ask the Court to vacate the dismissal. After one of the plaintiffs returned to the club on July 8, 1996 to find that the work had not yet begun, Rein sent a letter to Burdick requesting an explanation for the additional delay. *Id.* at 2–3. Burdick responded, in a letter dated July 17, 1996, that Kane was in a "state of deep depression" due to the death of his wife and was also suffering from partial blindness from his glaucoma condition. Burdick Decl. Exh. 3 at 4. The July 17 letter also included assurances that the permits and plans were in order and that the restroom upgrades would begin in August. *Id.*

On August 22, 1996, Rein sent a letter to Burdick stating his intention to file a new lawsuit on behalf of his clients, Robert Freiler, a plaintiff in *Catalyst I*, and Robert MacDougal, another wheelchair user, who were denied access to the Catalyst on August 14, 1996. *Id.* at 5–6. Rein also expressed his intention to seek damages in the form of sanctions for contempt of court for Kane's failure to provide the access under the Settlement Agreement. *Id.* at 5–6. After a telephone conversation with Rein regarding the August 22 letter, Burdick replied that Kane's grief created "circumstances beyond [his] control" and impeded the project's progress. However, Burdick also announced that a contractor and an architect had been hired and that they expected all work to be complete by mid-November. *Id.* at 7–8.

Nonetheless, in late October, Rein found that the compliance work had not yet commenced and filed *Catalyst II* on November 1, 1996. The allegations in the complaint were virtually identical to those of *Catalyst I* with regard to the club's inability to provide access for disabled patrons. The main differences in *Catalyst II* related to the experiences of the plaintiffs on their particular visits to the club. Plaintiffs also complained that food service was unavailable to them on Mondays and Tuesdays because it was offered only on the second floor of the club and no lift was available. See Rein Decl. Exhibit A. On January 3, 1997, Kane's failure to begin the necessary construction work prompted Rein to write to Burdick informing him that plaintiffs would seek an injunction ordering immediate access for the disabled or closure of the club until such access was available. Rein Decl. Exhibit J. Again Burdick responded using the death of Kane's wife as an excuse for the delay and in a January 22, 1997 letter, Burdick stated that Kane had closed the Catalyst and would perform all work with a target date of February 3, 1997. Burdick also wrote that the food service issue would be corrected by having a downstairs server available on those nights for patrons who could not reach the second floor. Rein Decl. Exh. K.

The construction was delayed yet again and the letter writing and telephone calls between the parties intensified. The correspondence transpired a few more months and much of the work was finished by May 1, 1997. On June 19, 1997, Rein informed Kane by letter that the lift as installed did not provide "full and equal access" because it required a key for operation. The letter set forth several impediments to the resolution of the case, including the requirement that the lift be made operable without a key. In addition to the problems with the lift, plaintiffs found the restroom renovations inadequate, and stated that if defendants did not remedy the situation, plaintiffs would request an injunction and their attorneys' fees would increase substantially. Rein Decl. Exh. J. On July 14, 1997, defendants' extended a Rule 68 offer to plaintiffs which offered them each an amount of money and attempted to meet their demands for access. Rein Decl. Exh. K. Plaintiffs rejected this

offer as improper and the correspondence and telephone calls thus continued between the parties.

Eventually, in January of 1998, plaintiffs drafted a Consent Decree to settle the physical alterations to the club and its policy for dealing with disabled guests. The parties disagreed over the terms of the Consent Decree and at the time of their February 23, 1998 case management conference, the parties were still in disagreement over damages, attorneys' fees and costs. The additional repairs to the lift were finished in the summer of 1998 but plaintiffs remained unsatisfied with its operation and called in OSHA inspectors. By late October, at the demand of the plaintiffs, the Fire Marshal and OSHA approved the lift and the parties reached a settlement to all claims except attorneys' fees and costs. Because the parties could not reach an agreement regarding the issue of attorneys' fees, litigation expenses and costs, they agreed to allow the Court to resolve the issue of appropriate fees.

## LEGAL STANDARD

The parties have agreed that the Court shall determine the amount of reasonable attorneys' fees and costs to be awarded to the plaintiffs[2]. "In determining a reasonable attorney's fee, the district court's first step is to calculate a 'lodestar' by multiplying the number of hours it finds the prevailing party expended on the litigation by a reasonable hourly rate." *McGrath v. County of Nevada,* 67 F.3d 248, 252 (9th Cir.1995) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)). This is the minimum the court must do to discharge its review. *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1211 n. 3 (9th Cir.1986). The Supreme Court has emphasized that the lodestar fee should be presumed reasonable unless exceptional circumstances justify deviation. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 742, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). The Court has also explained that "the novelty and complexity of the issues [is] ... fully reflected by the number of billable hours recorded by counsel and thus do not warrant an ... adjustment in a fee based on the number of billable hours times reasonable hourly rates." *Blum v. Stenson,* 465 U.S. 886, 898, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

The Ninth Circuit standard for varying the "lodestar" amount to reflect the particulars of a given case is provided in *Kerr v. Screen Extras Guild,* 526 F.2d 67, 70 (9th Cir.1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). *Kerr* adopted the Fifth Circuit's reasoning in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), and used twelve factors for possible adjustment of the lodestar figure. They are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[3] While *Blum* may cast doubt on the viability of the second *Kerr* factor, the Ninth Circuit continues to employ the factors as potential bases of adjustment to the initial lodestar calculation. *See, e.g., Widrig v. Apfel,*

---

**2.** The Consent Decree provides for two sources of law to control the Court's cost analysis: (1) the ADA's fee shifting provision, now codified at 42 U.S.C. § 12205, which allows the Court to award "a reasonable attorney's fee, including litigation expenses, and costs" to the prevailing party; and .(2) Cal. Civil Code 54.3, which provides for attorney's fees " as may be determined by the court" in cases involving, *inter alia,* access of the disabled to public accommodations.

**3.** The factors are now commonly known as the *Johnson–Kerr* factors.

140 F.3d 1207, 1209 (9th Cir.1998). The court need not discuss each of the *Kerr* factors, so long as it discusses those relevant to the particular case. *Quesada v. Thomason*, 850 F.2d 537, 539 (9th Cir. 1988) (citing *Kessler v. Associates Fin. Services Co.*, 639 F.2d 498 (9th Cir.1981)).

## LODESTAR AND JOHNSON–KERR ANALYSIS

The plaintiffs request fees for the two attorneys who worked on the case: (1) Paul R. Rein at a rate of $325/hour for 156.8 hours and (2) Tim Thimesch ("Thimesch") at a rate of $195/hour for 10.3 hours, in addition to litigation expenses and costs. Plaintiffs' Motion for Attorneys' Fees, Litigation Expenses and Costs at 25. Defendants object to both the reasonableness of the time billed and the hourly rates charged by the plaintiffs. In addition, defendants oppose any fees billed after the Rule 68 offer was submitted in this case as well as any fees based on the preparation of this motion.

■ In determining the reasonableness of the fee, the court first must assess the number of hours reasonably spent on the litigation. The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." *See Hensley*, 461 U.S. at 434, 103 S.Ct. 1933.

■ The Court finds that in this instance the number of hours billed was reasonable. *Catalyst II* dragged on for three years due to the defendants' failure to comply with the terms of the *Catalyst I* Settlement Agreement. Rein and his associate, Thimesch, spent and logged a reasonable number of hours communicating with their clients and the defendants attempting to ascertain when and how the work on the nightclub would be completed.

However, the defendants' objections to the hourly rates charged by the plaintiffs for routine tasks that could have been performed by his associate, and for clerical tasks billed at lawyers' rates are proper. Rein has billed 156.8 hours at a rate of $325 for each and every task he per-

formed, from scheduling dates for conferences and receiving notice of motions to drafting the complaint. The Court finds that this blanket rate is inappropriate for a significant portion of Rein's work performed and is an exercise of poor "billing judgment." "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933 (citing *Copeland v. Marshall*, 641 F.2d 880, 891 (1980)) (*en banc*) (emphasis in original).

■ Although some of Rein's hours billed were necessary to this litigation, the Court does not approve of "[t]he wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates ... A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3rd Cir.1983). "When a lawyer spends time on tasks that are easily delegable to non-professional assistance, legal service rates are not applicable." *New Mexico Citizens for Clean Air and Water v. Espanola Mercantile Company, Inc.*, 72 F.3d 830, 834 (10th Cir.1996) (citing *Halderman ex rel. Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 942 (3rd Cir.1995)). Rein's 30 years as a trial lawyer, including more than 20 years' experience representing the disabled in cases like this one, are proof that his $325/hour rate is proper for his legal expertise. Regardless, the Court finds that Rein billed his $325 rate for over 70 hours of tasks usually performed by less experienced associates, paralegals or secretaries and for time spent traveling to and from court appearances.

As noted by the defendants, Rein billed five hours for drafting the complaint for *Catalyst II*. This complaint was largely a clone of that filed in *Catalyst I*, with the substitution of the new plaintiffs and the

facts depicting their experience at the Catalyst, and did not warrant a fee of $1625. Similarly, Rein billed his $325 rate for the preparation of his motion for attorneys' fees. This motion and its supporting declarations were mainly reproductions of documents filed and utilized in Rein's other cases and the Court finds the 8.4 hours billed did not warrant any specialized legal expertise. Equally puzzling is Rein's billing of 8.1 hours for "file review" and "memo[s]." These hours, at $325 each, are difficult for the Court to justify, particularly when many of the entries titled "memo" fail to provide any details as to their content or necessity.

■ Rein also billed his full rate for the preparation of forms like those for the reassignment of the case to another district judge, or for arrangements for filing, service, faxing and scheduling appointments. These tasks require little or no legal training to perform and should be billed at paralegal or secretarial rates. In total, Rein billed 6.9 hours of his time for clerical work and the Court finds it within its discretion to reduce the hourly rate to $110 [4] for this time.

■ Moreover, 26.4 of Rein's hours billed relate to the letters exchanged between himself and Burdick regarding the progress, or lack thereof, on the construction work at the Catalyst. The letters from both parties averaged one page in length and either asked for or provided an explanation for Kane's delays in construction. The Court, in its experience, finds these letters and the telephone calls regarding the letters, could have been undertaken by less experienced associates because they did not require Rein's legal expertise and did not directly involve client contact. The Court is aware that Rein did not have the resources or staff of a large law firm to support him during this litigation. Nevertheless, Rein is charged with utilizing "billing judgment" when charging for his services and should not receive a windfall in fees merely because he asks for them. Even if Rein was unable to perform the work at a lower rate, his associate, Thimesch, could have handled most of the letters to and from the defendants at his hourly rate of $195 [5]. Accordingly, the Court will reduce the rate billed by Rein for 26.4 of his billable hours to $195 per hour.

■ Furthermore, Rein billed 29.5 hours for client telephone calls and letters. Although the Court finds no fault with Rein's commitment to remaining in constant communication with his clients, the $325 rate was unreasonably billed for instances where Rein left messages at his clients' offices and for letters which did little more than regurgitate the information from Rein's letters to Burdick. Again, these client updates could have been fielded by Rein's associate or at least billed at that rate and therefore the Court reduces the rate billed for 15 of these hours as a result.

■ Another area where Rein failed to use "billing judgment" is his time charged for traveling to and from court for appearances and for site inspections at the Catalyst. In total, Rein billed 37.7 hours for these trips, all at his $325 rate. As the Second Circuit has noted, "a different rate of compensation may well be set for different types of litigation tasks." *Cohen v. W. Haven Bd. of Police Comm'rs.*, 638 F.2d 496, 505 (2d Cir.1980). Thus, the Court

---

4. Rein included a sampling of current paralegal rates with his declaration in support of plaintiffs' motion for attorneys' fees. See Rein Decl. Exhibit F at 4–17. The Court has reviewed these rates and finds $110 per hour to be a reasonable rate for paralegal work like that billed in the case at bar.

5. The Court deems the $195 rate charged by Thimesch is reasonable in light of his ten years of experience, the prevailing market rates as well as the September 22, 1997 order from Superior Court Judge Kawaichi finding that this rate was reasonable. Supplemental Declaration of Paul R. Rein in Reply to Defendants' Opposition to Plaintiffs' Motion for an Award for Attorneys' Fees, Litigation Expenses and Costs Pursuant to Settlement Agreement Exhibit U.

finds that at least half of the travel time billed by Rein was unproductive, in that it was not time spent actually appearing in court or on site at the Catalyst and reduces Rein's rate for 15 of these hours to a more reasonable rate of $195 per hour.

Plaintiffs defend their billing rates and hours claiming that fully compensatory awards of attorneys' fees are the only way to ensure that these 'private attorney general' cases continue to be brought on behalf of the disabled. The Court finds that its award in this case will fully compensate plaintiffs' attorneys by calculating a *reasonable* fee. The Supreme Court in *Blum* emphasized a reasonable attorney's fee should be adequate to attract competent counsel but does not produce windfalls to attorneys. *Blum,* 465 U.S. at 886, 104 S.Ct. 1541. In this instance, the Court exercises its discretion to adjust Rein's billing rate to reflect a reasonable fee for the type of work done and to represent the Court's recognition that most of these fees could have been avoided if the plaintiffs had sought a contempt order from the *Catalyst I* Court instead of filing *Catalyst II.*

The Court finds the amount requested for court costs and litigation expenses appropriate and awards the following in attorneys' fees:

| Paul L. Rein | $325/hour | 72.0 | $ 23,400.00 |
|---|---|---|---|
| Associate Rate | $195/hour | 77.9 | $ 15,190.50 |
| Paralegal Rate | $110/hour | 6.9 | $ 759.00 |
| Tim Thimesch | $195/hour | 10.3 | $ 2,008.50 |
| | Total Attorneys' Fees | | $ 41,358.00 |
| Litigation Expenses and Costs: | | | $ 1,705.00 |
| Total Fees, Litigation Expenses and Costs: | | | $ 43,063.00 |

## CONCLUSION

Based on the previous discussion and lodestar analysis, the Court orders defendant to pay $43,063.00 in attorneys' fees, litigation expenses and costs to the plaintiffs.

**IT IS SO ORDERED.**